UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

ROCHESTER, NY NAACP BRANCH #2172,
FAITH LEADERS ROUNDTABLE,
ROBIN WILT,
PASTOR MYRA BROWN,                                    **COMPLAINT**
PASTOR JAMES COOPER, SR., and
DR. GAYLE HARRISON,                                    Civil Action No. 22-6558

                                                Plaintiffs,

                                                       v.

MONROE COUNTY,
ADAM BELLO, as the County Executive of Monroe
County,
SABRINA LAMAR, as President of the Monroe County
Legislature,
STEVEN BREW, as the Majority Leader of the Monroe
County Legislature,
YVERSHA ROMAN, as the Minority Leader of the
Monroe County Legislature,
JACKIE ORTIZ, as a Monroe County Elections
Commissioner, and
LISA P. NICOLAY, as a Monroe County Elections
Commissioner,

                                                  Defendants.

------------------------------------------------------------------X

Plaintiffs, above-named, by their attorney, Nate McMurray of ADVOCATES FOR JUSTICE, CHARTERED ATTORNEYS for their Complaint against the defendants, above-named, alleges as follows:

### JURISDICTION AND VENUE

1.     This court has jurisdiction over plaintiff's federal constitutional claims pursuant to 28 USC §1331, 28 USC §1343, and 42 USC §1983.

2.     This court has jurisdiction to declare a judgment pursuant to 28 USC §2201.

3. This court has supplemental jurisdiction over plaintiffs related state law claims pursuant to 28 USC §1367.

4. Venue of this action is properly in this district, pursuant to 28 U.S.C. § 1391(b), on the grounds that defendants are residents of this district and the claims herein alleged arose in this district.

**PARTIES**

5. PLAINTIFF ROCHESTER, NY NAACP BRANCH #2172, the Rochester, NY Branch of the National Association for the Advancement of Colored People, works to secure political, educational, social, and economic equality of rights in order to eliminate race-based discrimination and ensure the health and well-being of all. The organization's officers include President John Singleton, III, Secretary Kiesha Ivey, and Treasurer Kiera Hudson. The Executive Committee is comprised of notable community leaders including Dr. B.A. Singleton-Pradia, Ms. Rene Joyner, Jason Harrington, Esq., Pastor Wanda Wilson, Rev. Myra Brown, Ms. Tianna Johnson, and Rev. Debra Porcher.

6. PLAINTIFF FAITH LEADERS ROUNDTABLE, an organization made up of some of Rochester's leading African American faith leaders, including Pastor Myra Brown, Pastor James Cooper, Sr., Bishop Jeffrey Melvin, Pastor Bernard McNeil, and Elder Benjamin Cox, among many other well-known leaders.

7. PLAINTIFF ROBIN WILT is an Ivy League educated alumna of Dartmouth College, a member of the Phi Beta Kappa Academic Honor Society, a former United States Congressional candidate, one of the founding members and current co-chair of the Black Caucus of Greater Rochester Association of Realtors, and the only Black elected member of the Brighton Town Board—the longest-serving Black Town Board member in the Town's over 100-year history.

8. PLAINTIFF MYRA BROWN is the lead pastor of Spiritus Christi, an independent Catholic Church, where she founded SPARC (Spiritus' Racial Justice Ministry), an Adopt-a-Family program for the poor, and a Caring Connections group for parishioners and their caregivers. Pastor Brown is a well-known civil rights leader, having marched in the 2020 protests calling for justice for Daniel Prude and led a racial justice program for elected officials and candidates amidst those protests. On December 5, Pastor Brown was named to City and State NY's Faith Power 100, a list of the most influential spiritual leaders in New York State.

9. PLAINTIFF PASTOR JAMES COOPER, SR. Is the lead pastor of Love Fellowship Worship Center, a non-denominational Christian ministry, and a co-convenor of The Faith Leaders Roundtable.

10. PLAINTIFF DR. GAYLE HARRISON is a resident of Rochester and a retired developmental psychologist who is active with social and racial justice issues. She holds a Bachelor's Degree from Brown University, a Master's Degree from Clark University, and a Doctorate from Boston College. She is a proud member of Baber A.M.E. Church, Delta Sigma Sorority, and RocACTS, an interfaith community organizing project of multi-racial, interfaith, urban and suburban congregations and groups that will train and empower citizens to create systemic change and shape the political, social and economic decisions that impact their lives.

11. DEFENDANT MONROE COUNTY is a municipal corporation organized and existing under and by virtue of the laws of the State of New York, which is comprised of the City of Rochester, 19 towns, and 10 villages, and according to the 2020 census from the United States Bureau of the Census, contains a total of 759,443 people.

12. DEFENDANT ADAM BELLO is the Monroe County Executive elected by the voters of Monroe County. He is being sued in his official capacity.

3

13. DEFENDANT SABRINA LAMAR is the duly elected president of the Monroe County Legislature, and she is being sued in her official capacity.

14. DEFENDANT STEPHEN BREW is the majority leader of the Monroe County Legislature and is duly elected to such position, and he is being sued in his official capacity.

15. DEFENDANT YVERSHA ROMAN is the minority leader of the Monroe County Legislature and is duly elected to such position, and she is being sued in her official capacity.

16. DEFENDANT JACKIE ORTIZ is the duly elected elections commissioner for Monroe County and is being sued in her official capacity.

17. DEFENDANT LISA P. NICOLAY is the duly elected elections commissioner for Monroe County and is being sued in her official capacity.

## FACTUAL COMMON TO ALL CLAIMS

### A.  THE LAW REQUIRES FAIR REDISTRICTING EVERY TEN YEARS

18. The Supreme Court requires that local governmental districts have roughly equal populations based on the principle of "one [person], one vote," *Avery v. Midland County*, 390 U.S. 474 (1968). Monroe County, NY, like other jurisdictions, is required to modify its legislative district lines based on population data received from the decennial US Census to comply with this mandate.

19. Through decades of case precedent, the courts have taken this principle and expanded upon it to prioritize the following criteria in redistricting: population equality among the districts, fair representation of minority groups, contiguity, compactness, and the preservation of communities of interest.

20. For the principle of population equality, the court applies different standards to congressional districts versus state and local plans. At the national level, the Court insists on strict

equality, requiring congressional districts be "as nearly equal in population... as practicable," *White v. Weiser*, 412 U.S. 783 (1973).

21. In state and local apportionment plans, however, the Court has adopted a more flexible approach, generally permitting state and local districts to deviate up to ten percent from the ideal size, *Voinovich v. Quilter*, 507 U.S. 146 (1993). New York State reduces allowable maximum deviation in county districts to five percent, NYS Chapter Law 516 of 2021.

22. In the 2020 U.S. Census, Monroe County saw its population increase from 744,344 to 759,443 residents, an increase of about 2.03 percent or 15,099 individuals. The City of Rochester saw its population grow from 210,674 to 211,328, an increase of about 0.31 percent or 654 individuals. Thus, neither Monroe County, nor the City of Rochester experienced a significant change in population.

23. Utilizing the 2020 US Census, the new mean county legislative district has a population of 26,188 individuals. With a permissible deviation of five percent between the largest and smallest districts, the new county legislative districts may be as large as 26,843 individuals, or as small 25,533 individuals [new mean = 26,187.69 rounded to 26,188, 5% of 26,188 = 1309.4 rounded to 1309, thus districts may be plus or minus 654.9, rounded to 655 of 26,188].

24. Fair representation of minority groups refers to the principle that racial and linguistic minority groups should have an equal opportunity with other citizens to participate in the political process and elect representatives of their choice. This principle is espoused in the federal Voting Rights Act.

25. Contiguity is generally held to mean that no district should be separated from itself entirely by another district, and that each district shall consist of a contiguous territory as required by the laws and constitutional requirements of New York State and the Monroe County Charter.

26. Compactness means that any two locations within a district should be as geographically close to each other as possible, as required by the law, and the constitutional requirements of New York State and the Monroe County Charter.

27. Preservation of communities of interest means that communities that have shared interests, including geographic, social, economic, or other interests, should be united in districts where possible

28. In order to achieve a redistricting plan consistent with the requirements of the United States Constitution, the State of New York Constitution, and the Monroe County Charter, these principles of population equality, contiguity, fair representation of minority groups, respect for political subdivisions, compactness and preservation of communities of interest, must be considered. To this point, these principles of fair representation have been largely ignored.

**B.  THE COUNTY EXECUTIVE'S ACTIONS—VETOES, FAILED UNILATERAL PROPOSALS, AND POLITICAL GAMESMANSHIP—HAVE IGNORED THE PRINCIPLES OF REDISTRICTING AND LED TO A STALLED POLITICAL PROCESS**

29. In Monroe County Democrats outnumber Republicans by nearly a 2-1 ratio. Yet Republicans retain control the County Legislature, which is an issue that Democratic County Executive Adam Bello wanted to resolve in his favor and the favor of his political party from the start of the decennial redistricting process in 2020.

30. Specifically, as demonstrated by the facts in this complaint, he did not want to use the Republican controlled Legislature to draw district lines. He wanted to stall, delay, and attempt other tactics to remove the redistricting process from the Legislature so that he could achieve partisan dominance in his favor. He did this without regard to laws protecting minority representation or other voting rights.

31. In the summer of 2020, County Executive Adam Bello proposed an independent redistricting commission to oversee redrawing district lines in the Monroe County Legislature, which would allow a County Executive to directly participate in the process for the first time.

32. The Monroe County Legislature voted against the County Executive's unilateral proposal because they wanted an opportunity to work in a bipartisan fashion to create new voting districts themselves.

33. Members of the Black and Asian caucus (in particular) wanted strongly to represent their own interests in the redistricting process and were leery of the County Executive's efforts to strip them of this power.

34. Later, in December 2021, by a vote of 20-9, after considerable effort, the Monroe Legislature voted to create new legislative district lines using the process established by County Charter. County Executive Adam Bello, however, unilaterally vetoed these maps with little explanation other than to say the new district lines were made without "public input."

35. After the County Executive's veto in January 2022, the County Executive (still eager to remove the process from the Legislature for partisan control) made a second proposal to establish an independent redistricting commission, which again did not pass the Legislature.

36. Following this second failure by the County Executive to unilaterally remove the redistricting powers from the Legislature, the Democratic leadership made very limited efforts to work within the Legislature itself to complete the redistricting process.

37. As part of their obstructionist approach, in July of 2022, then-Party Chairman Zach King told the Democratic caucus not to negotiate further, stating that it would be better for the Democratic caucus to "go to court."

38. Party Chairman King went further telling members of the Democratic caucus that their overriding interest must be partisan, i.e., the long-term dominance of the Democratic Party and its current leadership.

39. The requirements and demands of the Voting Rights Act and other relevant laws were never referenced by Chairman King or County Executive Bello or any other Monroe County Democratic leader in the County Legislature at this time. They wanted—first and foremost—to have a map that reflected party enrollment and therefore Democratic dominance.

40. Further, in July 2022, Chairman King noted to Democrats that efforts by Monroe County Legislature President Sabrina Lamar to increase Black majority legislative districts were unacceptable to the Democratic Party because changes in voting demographics may lead to primary challenges by minorities to incumbent Democrats, and thus Lamar must be stopped.

41. To stop Lamar, in August 2022, Deputy County Executive Jeff McCann sent a text message to the Democratic caucus in which he stated that the county will be conducting a Voting Rights Act analysis (using lawyers apparently hired by Bello, but not available to the Legislature); thus implying no Voting Rights Act analysis was complete up until that point by the County Executive. Thus, nearly two years into the process, the County Executive's office apparently had not even considered the relevancy of the preeminent voting rights law in America.

42. McCann encouraged the Democratic Caucus (in texts) to oppose Lamar's efforts to increase Black representation without fear of being called "racist" by Lamar or others.

43. Meanwhile, County Executive Bello himself called Legislators interested in passing a map that empathized minority representation over party partisanship to scold them for lack of loyalty towards their incumbent Democratic colleagues.

44. Following the County Executive's lead, the Democratic Caucus released a press release stating that they wanted "majority minority" districts, a concept whereby minority groups are combined for representation, which violates the Voting Rights Act and dilutes Black votes by reducing the number of Black majority districts.

45. Going further, in media interviews and online posts, Defendant Minority Leader Yversha Roman openly advocated against Black majority districts stating, among other things, that Black districts were unfair because ". . . they do not give us an opportunity for representation."

46. Minority Leader Roman stated at the September 6, 2022, Redistricting Commission hearing, "As a woman of color, I am absolutely sick of being told that I am only capable enough to run an organization or to serve people of color or to lead districts that are mainly made up of people of color . . . Legislator Barnhart came up here and said we can elect five Black people if we have these districts. That is completely against what I'm trying to do here."

47. Minority Leader Roman also said on a radio program about "majority-minority" districts, "I agree it limits Black influence." On the same radio program, she said about Black districts, ""It does not give us an opportunity to have representation."

48. Minority Leader Roman told a TV station, "We can elect five black people if we have these districts that is completely against what I'm trying to do here . . ."

49. Despite these efforts to obstruct the Legislative process and undermine the Voting Rights Act, on October 21, 2022, the County Legislature, by majority vote (17-12), adopted a new local law, amending the Monroe County Charter and the Monroe County Administrative Code relating to legislative district boundaries, i.e., they passed another new map.

50. This new map became known as the "Crescent Map," because it advanced African American voting rights the area of Rochester known as "The Crescent," which is made up largely of African Voters who have been historically under-served, underrepresented, and disenfranchised.

51. The Crescent Map was subjected to considerable public scrutiny and review—most of which was overwhelmingly favorable, as documented by numerous recorded Legislative video sessions.

52. Despite this new Crescent Map, neither County Executive Adam Bello nor the leadership of the Democratic Caucus made any material efforts to resolve issues they had with the map. Instead, they continued—as they had done with previous proposals—to tear down and aggressively attack the Crescent Map and those who advocated for it. Specifically, they did not call for a meeting to negotiate, make any effort to publicly suggest amendments, or otherwise deviate from their per-determined strategy of going to court.

53. The Democratic Caucus did, however, issue a press release in which they advocated for the controversial position set forth previously by the State of Louisiana to limit those who could be counted as Black or African American to only those individuals who are "all Black" (quoting a phrase used in private conversations among Legislators).

54. In other words, the Democratic caucus advocated lowering the number of Black voters (and thus the requirements of the Voting Rights Act for districts that reflect the Black population). They did not want to count individuals who self-identify as Black and another race counted as Black and thus considered for Black representation for the purposes of redistricting.

55. The goal of such a position is simple: They wanted to decrease the number of Black voters to justify and limit the number of Black voting districts

56. County Executive Bello also maligned the Crescent Map by advocating for a new map featuring 6 "effective" Black districts, which is a euphemism meant to undermine true Black representation. In particular, and as understood after considering the commentary of experts hired by Bello (using taxpayer funds) to justify his partisan goals, effective Black districts are districts that may elect Black leaders, even if Black voters do not make up a majority of the voters in the district.

57. Then in November, pursuant to New York Municipal Home Rule and the Monroe County Charter, County Executive Adam Bello again vetoed the work of the Monroe County Legislature, as he vetoed the Crescent Map.

58. In total, these combined efforts by the Democratic leadership under the direction of County Executive Adam Bello and his surrogates amount to an orchestrated and deliberate attempt to undermine Black representation for partisan political gain in Monroe County.

C. **BECAUSE OF THE COUNTY EXECUTIVE'S EFFORTS TO BLOCK THE WORK OF THE LEGISLATURE, MONROE COUNTY FACES A CRISIS THAT REQUIRES JUDICIAL INTERVENTION**

59. As a consequence of County Executive Bello's efforts to reject and stifle the work of the Legislature, there is no Local Law in Monroe County governing the redistricting of legislative districts based on the 2020 decennial census. In other words, there are no maps to hold elections in 2023 for the Monroe County Legislature as required by the Monroe County Charter.

60. We regretfully, therefore, bring this action, to request of the court's judicial intervention. But in bringing this complaint, we emphatically highlight that judicial resolution was likely the goal of County Executive Bello, because he knew he could not achieve partisan dominance in the democratic forum of the County Legislature.

61. His efforts to create a stalemate were designed to find a venue where he may have more leverage to influence redistricting lines. His stratagem must not be rewarded. More importantly, the demands of Voting Rights Act and the will of the people of Monroe County to finally give fair representation to the African American community must not be ignored.

## COUNT ONE

### VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION PURSUANT TO 42 USC § 1983

62. Plaintiffs re-allege and repeat as though set forth herein all allegations in paragraphs contained above.

63. The use of Monroe County's current legislative districts for the 2023 legislative elections would violate the constitution of the United States.

64. Plaintiffs live in Monroe County in various legislative districts and without lawful redistricting consistent with the Constitution of the United States, the plaintiffs will be denied equal protection of the law and Monroe County's elected representatives in the county legislature will be elected in an unconstitutional election.

65. Monroe County needs new legislative districts before the 2023 elections to comply with the requirements of the United States Constitution.

## COUNT TWO

### VIOLATION OF THE NEW YORK STATE CONSTITUTION

66. Plaintiffs re-allege and repeat as though set forth herein all allegations contained above.

67. Monroe County's current legislative districts exist in violation of the population equality requirements of Article 3, Section 4 and Article 5 of the New York State Constitution.

12

68. Monroe County needs a new legislative district map and law before the next elections for the County legislature which election process will commence early in 2023.

69. To remedy these violations of the New York State Constitution in a timely manner, this court should take control of the redistricting process and oversee the re-drawing of maps pursuant to fair and legal criteria, in adherence to the Voting Rights Act and the demands of fair representation for heretofore underrepresented minority communities, and the long-underrepresented African American community.

## COUNT THREE

## VIOLATION OF THE MUNICIPAL HOME RULE LAW

70. Plaintiffs re-allege and repeat as though set forth herein all allegations contained above.

71. Section 10(13) of New York Municipal Home Rule provides, in pertinent part, that, a plan of apportionment must comply with the following standards:

> (a.) A plan of districting or redistricting adopted under this subparagraph shall comply with the following standards, which shall have priority in the order herein set forth, to the extent applicable:
>
> (i.) If such plan of districting or redistricting includes only single-member districts, such districts shall be as nearly equal in population as is practicable; the difference in population between the most and least populous district shall not exceed five percent of the mean population of all districts. If such plan of districting or redistricting includes multi-member districts, the plan shall provide substantially equal weight for the population of that local government in the allocation of representation in the local legislative body; and
>
> (ii.) Districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minority groups to participate in the political process or to diminish their ability to elect representatives of their choice; and
>
> (iii.) Districts shall consist of contiguous territory; and
>
> (iv.) Districts shall be as compact in form as practicable; and

(v.) Districts shall not be drawn to discourage competition or for the purpose of favoring or disfavoring incumbents or other particular candidates or political parties. The maintenance of cores of existing districts, of pre-existing political subdivisions including cities, villages, and towns, and of communities of interest shall also be considered. To the extent practicable, no villages or cities or towns except those having more than forty percent of a full ratio for each district shall be divided; and

(vi.) Districts shall be formed so as to promote the orderly and efficient administration of elections.

72. Monroe County needs a new legislative district map and law before the next elections for the County Legislature which will commence early in 2023 and any new map must comply with the requirements of Section 10 of the New York Municipal Home Rule Law.

## COUNT FOUR

## VIOLATION OF THE MONROE COUNTY CHARTER

73. Plaintiffs re-allege and repeat as though set forth herein all allegations contained above.

74. Monroe County's current legislative districts, established by a Local Law in 2012, exist in violation of the population equality and other requirements of the Monroe County Charter.

75. The Monroe County Charter provides, in pertinent part that any reapportionment plan devised by any Commission or embodied in any Local Law "shall comply with the equal protection clauses of the Fourteenth Amendment of the United States Constitution and Article I, §§ 1 and 11 New York State Constitution. Further, legislative districts shall be of compact and contiguous territory to the extent possible." County Charter, Article 2, Section C2-12(c)(4).

76. Monroe County needs a new legislative district map and law consistent with the Monroe County Charter before the next elections process for the County Legislature which will commence as part of the designation process early in 2023.

77. To remedy these violations of the Monroe County Charter in a timely manner, this court should take control of the redistricting process and oversee the re-drawing of maps pursuant to fair and legal criteria.

78. The court should appoint a special master to prepare a redistricting plan considering the legislative stalemate over the 2023 redistricting of the Monroe County Legislature. In the interest of justice, the special master appointed by the court should be entirely independent of partisan interests and the court order appointing the special master should require that the special master's redistricting plan be independent of partisan interest. The court should order the special master to comply with the Monroe County Charter and the Voting Rights Act and prioritize redistricting criteria, including population equality among the districts, contiguity, fair representation of minority groups, respect for political subdivisions, compactness, and the preservation of communities of interest.

79. Upon presentation of an appropriate independent redistricting plan by the special master that complies with the Monroe County Charter, the Court should adopt that plan and order elections to the Monroe County Legislature to proceed in 2023 using those districts.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief, as follows:

1. In light of the unique circumstances of this case, namely the failure of Monroe County to pass any legal redistricting plan in timely manner, and the need for the County Board of Elections to receive new lines no later than January 15, 2023, we respectfully request that the Court immediately direct the parties to submit a single plan to a Special Master for expedited review and selection, and immediately direct the parties to this lawsuit (including Defendant Bello) to submit their own plans for review and consideration by the Special Master.

2. For reasonable attorney's fees pursuant to 42 U.S.C. Section 1988;

3. For any and all statutory damages allowed by law;

4. For costs of suit herein incurred; and

5. For such other and further relief as this Court deems just and proper.

Dated: Buffalo, New York
December 14, 2022

                                ADVOCATES FOR JUSTICE,
                                CHARTERED ATTORNEYS
                                *Attorneys for Plaintiff*

                                By:        /s/ *Nathan McMurray*
                                          Nathan McMurray
                                225 Broadway, Suite 225
                                New York, New York 10007
                                (212) 285-1400/917-923-8136
                                Email: nmcmurray@advocatesny.com